```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------X
In re
                                    Chapter 11
LEHMAN BROTHERS HOLDINGS INC.       Case No. 08-13555 (SCC)
et al.,                             Jointly Administered

            Debtors.
--------------------------------X
In re                               SIPA
                                    Case No. 08-01420 (SCC)
LEHMAN BROTHERS INC.,

            Debtor.
--------------------------------X
FIRSTBANK PUERTO RICO,              Adv. Proc.
                                    No. 10-04103 (SCC)
            Plaintiff-Appellant,

      - against -                   MEMORANDUM AND ORDER

BARCLAYS CAPITAL INC.,                14 Civ. 1935 (NRB)

            Defendant-Appellee.
--------------------------------X
```

**NAOMI REICE BUCHWALD**
**UNITED STATES DISTRICT JUDGE**

### INTRODUCTION

This appeal arises from the insolvency proceedings of Lehman Brothers Holdings Inc. and its subsidiaries (collectively, "Lehman").

Long before Lehman filed for bankruptcy, plaintiff-appellant FirstBank Puerto Rico ("FirstBank") gave bonds to a Lehman entity as collateral for derivative transactions between FirstBank and Lehman. FirstBank's contract gave that counterparty license to

sell those bonds free of FirstBank's interest.  Once FirstBank's counterparty took advantage of that provision and sold all of FirstBank's collateral (as it happened, to a different Lehman entity), FirstBank retained nothing more than a contractual claim against its counterparty for return of the bonds at a later date. FirstBank, then, has no right to re-claim the collateral from the collateral's subsequent purchaser, Barclays Capital Inc. ("Barclays"), which bought the collateral at a bankruptcy sale. Therefore, we affirm the judgment of the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") granting summary judgment to Barclays.

At the time of the bankruptcy sale, the Bankruptcy Court enjoined suits against Barclays related to assets that Barclays purchased from Lehman in bankruptcy.  Because the Bankruptcy Court did not abuse its discretion in holding that FirstBank's suit violated this anti-suit injunction, we also affirm the Bankruptcy Court's sanctions against FirstBank.

**BACKGROUND**

I.   **FINANCIAL INSTRUMENTS**

Because this appeal requires us to discuss sophisticated transactions among the parties and various Lehman entities, we offer an overview of the securities, derivatives, and financing tools involved in this case.

A.   <u>Swaps</u>

    1.   *Definition of a Swap*

A swap is, generically, an over-the-counter transaction in which two parties agree to exchange the returns of two cash flows.

Perhaps the most simple example is an interest-rate swap.[1] <u>See generally</u> Frank J. Fabozzi et al., <u>Interest-Rate Swaps and Swaptions</u>, <u>in</u> <u>Handbook of Fixed Income Securities</u> 1445, 1445–46 (Frank J. Fabozzi ed. 2012).  One party agrees to pay a fixed rate of interest (say, 4%), while the other party pays a floating rate of interest based on some published rate that varies over time (say, "U.S.-dollar 3-month LIBOR, plus 1%"), with both interest payments calculated against the same notional amount of principal. At set intervals, one of the parties calculates the difference between the fixed-rate interest and the floating-rate interest, and the party that owes more interest pays the difference to the party that owes less interest.  Thus, if interest rates rise during the term of the swap, then the payer of the floating-rate leg will make a net payment; if interest rates fall, then the payer of the floating-rate leg will receive a net payment.

An interest-rate swap allows a party to gain or reduce exposure to interest rates.  <u>See</u> <u>id.</u> at 1445.  For example, suppose

---

[1] Other examples include currency swaps, commodity swaps, swaps on stock or bond indices, and swaps on credit derivatives.  <u>See, e.g.</u>, Paul C. Harding, <u>Mastering the ISDA® Master Agreements (1992 and 2002)</u> 4–5 (3d ed., 2010).

that a bank has loaned money to its customers at fixed interest rates, but that the bank borrows money at short-term rates that fluctuate.  Then the bank faces a risk that its own borrowing costs will increase from rising interest rates, while the bank's income, from its fixed-rate loans, will remain constant.  In such a circumstance, the bank can avoid this risk by entering into an interest rate swap with a swap dealer.  The bank will deliver fixed payments to the dealer, and will receive floating payments in return.  This effectively allows the bank to convert its fixed income into an income stream whose fluctuations will match the bank's borrowing costs.

## 2.  *Counterparty Risk*

Because swaps are traded directly between counterparties (rather than through an exchange), each party faces the risk that the other party will be unable to pay its net losses under the swap agreement.  See id. at 1446-47, 1474-75; Christian J. Johnson, Derivatives & Rehypothecation Failure: It's 3:00 P.M., Do You Know Where Your Collateral Is?, 39 Ariz. L. Rev. 949, 958-59 (Fall 1997).  Turning back to the example of an interest-rate swap, suppose prevailing interest rates fall, so that the bank (as the payer of a fixed rate and receiver of a floating rate) will expect to owe the swap dealer payments throughout the term of the swap. Until the bank successfully makes each payment, the swap dealer

faces the risk that the bank will become unable to pay. Conversely, if prevailing interest rates rise, then the swap dealer will expect to owe the bank payments throughout the term of the swap. Until the swap dealer successfully makes each payment, the bank faces the risk that the swap dealer will become unable to pay.

One partial solution to this credit risk is for one party (called the "pledgor") to give the other party (the "secured party") safe assets to hold as collateral. The pledgor retains the economic interest in its collateral. That is, when the pledged bonds pay interest, the secured party must deliver the interest to the pledgor, and the pledgor may re-claim and sell the pledged bonds upon proper notice (although the pledgor must then post other acceptable collateral in its place). See Jon Gregory, Counterparty Credit Risk 70-71 (2010).

Frequently, the swap parties will agree that, at certain intervals, the party with a net unrealized loss will deliver collateral to cover the unrealized loss. See id. at 60. If collateral is exchanged frequently enough, this exchange will prevent either side's counterparty credit exposure from becoming intolerably great.

The swap parties may also agree that one party (typically the party with weaker credit) will post some amount of collateral for each swap, called an "independent amount" or "initial margin,"

regardless of profit or loss on the swap.  This decreases the secured party's risk; if the pledgor defaults before the pledgor has an opportunity to post collateral against a sudden loss, the secured party will (it hopes) have enough initial margin to cover the pledgor's loss.  See id. at 67.  Conversely, the use of initial margin increases the pledgor's counterparty risk; if the secured party defaults, then the pledgor will not be able to offset the loss of its initial margin against any payments owed to the secured party.

### 3.   *Documentation and Rehypothecation*

A swap dealer does not re-negotiate the terms of its relationship with a customer each time the customer executes a swap.  Instead, a customer negotiates a single master agreement with a swap dealer, usually based on standard agreements published by the International Swaps and Derivatives Association, Inc. (ISDA).  This master agreement will include terms regarding the overall credit relationship between the parties—representations and warranties, events of default, termination procedures, procedures for offsetting debts between different trades, and so forth.  Once a master agreement is in place, each trade requires only a short confirmation to record essential details of the particular transaction, such as the notional principal, the fixed rate, the definition of the floating rate, and the term of the

swap.  *See generally* Harding, *supra*, at 9–16; Johnson, *supra*, at 957–58.

The standard ISDA Agreements do not govern the exchange of collateral.  Instead, parties who wish to collateralize their swap agreement will agree to collateralization terms in a separate document, such as a "Credit Support Annex" or a "Credit Support Deed."

In particular, some credit support documents allow the secured party to use or dispose of the collateral.  This is known as rehypothecation.  *See generally* Johnson, *supra*, *passim*.

Just as the pledgor retains the economic interest in bonds that are posted as collateral, *see* *supra* at 5, the pledgor continues to retain that economic interest after the secured party has rehypothecated the bonds.  This is because the secured party must still deliver any interest payments to the pledgor as though the secured party still held the collateral, and the pledgor may still re-claim and sell the pledged bonds upon proper notice.  *See* Paul C. Harding & Christian A. Johnson, *Mastering the ISDA® Collateral Documents* 279 (2d ed., 2012).

The main advantage of rehypothecation is to allow the secured party to finance its own operations; in exchange, the secured party offers the pledgor cheaper funding, or, at the margin, the secured party offers a swap line to a customer who would not otherwise

qualify.    Before 2007, at least some commentators believed that rehypothecation was "critical to the entire financial system." Gregory, _supra_, at 71 (citing M. Segoviano Basurto & M. Singh, _Counterparty Risk in the Over-the-counter Derivatives Market_ 1-19, IMF Working Papers (2008), _available at_ http://ssrn.com/abstract= 1316726).

The main disadvantage (at least to the pledgor) is that, as in this case, "the secured party could become insolvent and therefore be unable to return the posted collateral . . . ."    Harding & Johnson, _supra_, at 66.    This risk is especially great when the pledgor has posted collateral whose value exceeds the pledgor's unrealized losses (for example, when the pledgor posts an "independent amount"), because then the pledgor cannot set off the whole value of its collateral against its own unrealized losses. _See_ _id._ at 67; ISDA, _Independent Amounts_ 6-7 (release 2.0, Mar. 1, 2010), _available at_ http://www2.isda.org/attachment/MTY3MA== /Independent-Amount-WhitePaper-Final.pdf.    Because of this risk to the pledgor, "[r]ehypothecation rights are often heavily negotiated."    Harding & Johnson, _supra_, at 279; _cf._ Credit Support Annex between FirstBank and Bank of Montreal, Mar. 15, 2004, J.A. 1810-27 at ¶ 13(g)(ii) (forbidding rehypothecation).

B.   **Repurchase Agreements (Repos)**

A repurchase agreement (or repo) is, legally, a pair of bond sales: A seller sells a bond to a buyer, and the parties agree that the buyer will re-sell the bond back to the seller at a later date for a slightly higher price.[2]  Frank J. Fabozzi & Steven V. Mann, Financing Positions in the Bond Market, in Handbook of Fixed Income Securities 1355, 1355–56 (Frank J. Fabozzi ed. 2012)  In a "bilateral" repo——the kind that pertains to this case——the first sale transfers legal title to the purchaser-reseller, and the second sale transfers legal title back to the seller-repurchaser. See In re Lehman Bros. Inc., 506 B.R. 346, 349 (S.D.N.Y. 2014).

Although a repo is structured as a pair of sales, the economic substance is that the "seller" borrows money from the "buyer" and provides the bond as collateral.  See Fabozzi & Mann, Financing Positions, supra, at 1357.  A repo resembles a secured loan in that the borrower (or seller and repurchaser) retains the economic interest in the bonds.  When the bonds pay interest, the lender of cash must deliver the interest to the borrower.  See Frank J. Fabozzi & Steven V. Mann, Repurchase & Reverse Repurchase Agreements, in Securities Finance: Securities Lending & Repurchase

---

[2]The repurchase date is usually set at the time of the transaction, but a repo can be indefinite, with the repurchase to occur upon either party's demand.  See, e.g., Lehman Master Repurchase Agreement, J.A. 1214–21 ("Lehman MRA") at ¶ 3(b)(iii), (c).

Agreements 221, 237 (Frank J. Fabozzi & Steven V. Mann eds. 2005) (contrasting a repo to a "buy/sell back" transaction, in which the lender of cash obtains beneficial ownership of the bond).

The most important use of a repo is to secure financing. Suppose a bullish trader wants to have economic exposure to $300 of bonds, but has only $100 of cash.  See Fabozzi & Mann, Financing Positions, supra, at 1356.  The trader can accomplish this by combining two transactions: (1) an outright purchase of $300 in bonds from a bond dealer, and (2) a repo in which the trader borrows $200 from a repo dealer, delivers $200 of bonds as collateral, and commits to repurchase the bonds in the future. After making these transactions, the trader has $100 of bonds in hand, plus economic exposure to $200 in bonds that the trader has committed to repurchase from the repo dealer at a fixed price.

A trader might also wish to lend cash and borrow bonds.  See id. at 1357.  Suppose a bearish trader wants to have negative or short exposure to $100 of bonds.  The trader can accomplish this by combining two transactions: (1) an outright sale of $100 in bonds to a bond dealer, and (2) a repo in which the trader lends $100 to a repo dealer, takes $100 of bonds, and commits to resell the bonds in the future.  After these transactions, the trader has negative economic exposure to the $100 in bonds that the trader has committed to resell to the repo dealer at a fixed price.

As with swaps, traders do not re-negotiate their legal relationship for each new repo. Instead, a single master agreement (usually the Bond Market Association's Master Repurchase Agreement) governs the terms of repo trading, and short trade confirmations to document the details of each trade. See Fabozzi & Mann, Repurchase and Reverse Repurchase Agreements, supra at 225–26.

## II.   **TRANSACTIONS BETWEEN FIRSTBANK AND LEHMAN**

In 1997, FirstBank and Lehman Brothers Special Financing Inc.[3] executed an master agreement for trading interest rate swaps (the "Swap Agreement") based on a standard 1992 ISDA Master Agreement. See J.A. 1014–24 ("Stip. of Facts") ¶ 2; J.A. 1026–60 ("Swap Agr.")[4]; see also J.A. 1080–84 (June 2008 Amdt.).  At the same time, FirstBank and Lehman Swaps executed a credit support agreement (the "Credit Support Annex") to govern the exchange of collateral.  See Stip. of Facts ¶¶ 2–3; J.A. 1062–78 ("CSA").

FirstBank was required to post significant amounts of collateral to Lehman Swaps before FirstBank ever incurred losses on its swaps.  The Credit Support Annex defined FirstBank's "Credit

---

[3]Lehman Brothers Special Financing Inc. (Lehman Swaps or LBSF) was a subsidiary of Lehman Brothers Inc. (Lehman Brokerage or LBI), a U.S. broker-dealer, which was in turn a subsidiary of Lehman Brothers Holding Inc. (Lehman Holdings or LBHI).

[4]The signed Swap Agreement contains only the first and last page of ISDA's standard agreement, with signatures.  The parties agree that this was common industry practice, and indicates that the middle pages of ISDA's standard agreement constituted part of the contract.  See Stip. of Facts ¶ 2. We therefore treat the entire ISDA agreement as part of the Swap Agreement.

Support Amount" (or the amount of collateral that FirstBank was required to post) to be no less than the sum of all "Independent Amounts" applicable to FirstBank.  See CSA ¶ 13(b)(i)(C)(x).  These "Independent Amounts" were defined as 1% of the notional principal of each swap transaction, see J.A. 1374-78 ("Statement of Sept. 1, 2008") at 4-5.[5]  Additionally, FirstBank was required to post collateral to cover any unrealized losses on its underlying swaps. See CSA ¶ 13(b)(1)(C).[6]

The Credit Support Annex contained a standard rehypothecation clause, allowing Lehman Swaps to "sell, pledge, rehypothecate, assign, invest, use, commingle or otherwise dispose of, or otherwise use in its business[,] any Posted Collateral it holds, free from any claim or right of any nature whatsoever of [FirstBank], including any equity or right of redemption."  CSA ¶ 6(c)(i).  In the event that the underlying swaps terminated as a result of a default by Lehman Swaps, Lehman Swaps was obligated to immediately transfer all collateral back to FirstBank, except that

---

[5]It is unclear if these amounts were set at 1% in each trade confirmation, see CSA ¶ 13(b)(iv)(A), or if these amounts were set at 1% through a provision allowing Lehman Swaps to increase FirstBank's "Independent Amounts" by 1% whenever FirstBank's long-term credit ratings fell below certain thresholds, see June 2008 Amdt. ¶ 2c.

[6]The Credit Support Annex was nominally drafted as a two-way street. However, it does not appear that any trade confirmation ever required Lehman Swaps to post initial margin, and FirstBank had no unrealized profits to collateralize as of September 2008.  See Statement of Sept. 1, 2008 at 2-3. Therefore, only Lehman Swaps held collateral in September 2008.

Lehman Swaps was permitted to set off any amounts payable by FirstBank.  CSA ¶ 8(b)(iii),(iv).

The Swap Agreement itself allowed FirstBank to hold Lehman Swaps in default upon the occurrence of any of several events, including a voluntary bankruptcy filing of Lehman Swaps or Lehman Holdings and a failure to make any required payments.  See Swap Agr. ¶¶ 5(a)(I), (vii)(4), 6(a); Swap Agr., Sched., pt. 4, ¶ (g) (listing Lehman Holdings as a "Credit Support Provider," whose bankruptcy was to constitute a default event).  Upon proper notice of early termination following a default, Lehman Swaps was no longer allowed to rehypothecate FirstBank's collateral, and was required to return all collateral immediately to FirstBank.  See CSA ¶¶ 6(c), 8(b)(iii).   If Lehman Swaps failed to return FirstBank's collateral, then FirstBank was entitled to set off the value of the collateral against any losses that FirstBank owed Lehman Swaps on the underlying swaps.  See CSA ¶ 8(b)(iv).

Over time, FirstBank traded dozens of interest-rate swaps with Lehman Swaps.  Stip. of Facts ¶ 5.  To support this trading, FirstBank provided Lehman Swaps with investment-grade bonds issued by the Federal National Mortgage Association and the Government National Mortgage Association (the "Posted Bonds" or the "Posted Collateral").  See Stip. of Facts ¶ 8.  Lehman Brokerage took possession as Lehman Swaps' agent.  See Stip. of Facts ¶ 10.

Between February and September 2008 (but before the bankruptcy of any Lehman entity), Lehman Swaps sold some of the Posted Bonds to Lehman Brokerage in a series of repos (the "Intra-Lehman Repos"). <u>See</u> Stip. of Facts ¶ 12. As the Posted Bonds had previously been held by Lehman Brokerage as agent for Lehman Swaps, employees of Lehman Brokerage acted on both sides of this transaction. <u>See</u> Stip. of Facts ¶ 13. Lehman Swaps received approximately $51.9 million cash in exchange for approximately $57.8 million of the Posted Bonds (the "Bonds" or "Collateral").[7]

## III. **THE LEHMAN BANKRUPTCY AND SALE TO BARCLAYS**

On Monday, September 15, 2008, Lehman Holdings voluntarily petitioned for bankruptcy. <u>See</u> Stip. of Facts ¶ 17; Voluntary Petition, <u>In re Lehman Bros. Holdings Inc.</u>, No. 08-13555 (Bankr. S.D.N.Y. Sept. 15, 2008), ECF No. 1. At various times from that Monday through Wednesday, September 17, the Federal Reserve Bank of New York lent large amounts of money to Lehman Brokerage through repo transactions, in order to keep Lehman functioning during the bankruptcy proceedings. <u>See</u> Stip. of Facts ¶¶ 17–18 The Bonds were among the many securities that temporarily passed to the Fed through these repos. <u>See</u> Stip. of Facts ¶ 18.

---

[7]Barclays calculates the $51.9 million figure from the repo confirmations at J.A. 1843–2105, and FirstBank does not appear to dispute Barclays's calculation. We calculate the $57.8 million figure independently, based on the list of Repoed Bonds in the Stipulation of Facts (¶ 12) and the valuations as of August 29, 2008 in the September 1 Statement. <u>See</u> <u>infra</u>, Table 1.

The Federal Reserve un-wound these repos on Thursday, September 18, in anticipation that Barclays would take the Federal Reserve's place supplying emergency liquidity to Lehman. See Stip. of Facts ¶ 19.  Simultaneously, Lehman Brokerage sold the Bonds to Barclays as part of a repo (the "Barclays Repo") to replace the Federal Reserve's repo.  See Stip. of Facts ¶ 20.

On Friday, September 19, the Bankruptcy Court held a hearing (the "Sale Order Hearing") to review a proposed Asset Purchase Agreement (J.A. 1475–1523 ("APA")) and Sale Motion.  See Tr., In re Lehman Bros. Holding Co., No. 08-13555 (Bankr. S.D.N.Y. Sept. 19, 2008), ECF No. 318 ("Sale Order Hr'g Tr.").  Barclays agreed to purchase certain "Purchased Assets," see APA § 2.1, including, with exceptions, all assets "used in connection with" the "U.S. and Canadian investment banking and capital markets businesses of [LBHI and LBI]."  APA § 1.1.  These assets included Lehman Brokerage's "Long Positions," meaning "government securities . . . and collateralized short-term agreements with a book value as of the date hereof of approximately $70 billion."  APA § 1.1, definition of "Purchased Assets," clause (d).  Barclays also assumed many of Lehman Holdings' and Lehman Brokerage's liabilities, including "'repos' relating to any securities or interests of the type included in the definition of 'Long Positions.'"  APA § 2.3(i).

Following the Sale Order Hearing, the Bankruptcy Court issued a Sale Order to approve the purchase. See Order Authorizing and Approving (A) the Sale of Purchased Assets Free and Clear of Liens and Other Interests and (B) Assumption and Assignment of Executory Contracts and Unexpired Leases, In re Lehman Bros. Holding Inc., No. 08-13555 (Bankr. S.D.N.Y. Sept. 19, 2008), ECF No. 258, J.A. 1332-55 ("Sale Order"). In this order, the approved "Purchase Agreement" was defined to include both the APA that was before the Bankruptcy Court at the Sale Order Hearing and a forthcoming letter to clarify and supplement the APA (later known as the "Clarification Letter"). See Sale Order at 1. Further amendments were also permitted without court order, so long as any such amendment did not have a material adverse effect on the Lehman debtors' estates. See Sale Order at 21. The Sale Order enjoined all persons from pursuing claims to the Purchased Assets against Barclays; instead, those with claims to the Purchased Assets could make their claims against the money that Barclays paid Lehman. See Sale Order at 14. The Sale Order also recited a finding that notice was sufficient under the circumstances to satisfy due process. See Sale Order at 2-3.

On Monday, September 22, Lehman and Barclays publicized the Clarification Letter that the Sale Order had referred to. See Notice of Filing of Purchase Agreement, In re Lehman Bros. Holding

<u>Inc.</u>, No. 08-13555 (Bankr. S.D.N.Y. Sept. 22, 2008), ECF No. 280 Ex. C, J.A. 1528-43 ("Clar. Letter").  The Clarification Letter stated that "all securities and other assets held by [Barclays] under the [Barclays Repo] shall be deemed to constitute part of the Purchased Assets," that Barclays and Lehman "shall be deemed to have no further obligations to each other under the [Barclays Repo]," and that "the [Barclays Repo] shall terminate."  Clar. Letter § 13.  The Clarification Letter also explicitly included as "Purchased Assets" the assets listed on a confidential schedule. <u>See</u> Clar. Letter § 1(ii)(A); Schedule A.  This confidential Schedule A listed each of the Bonds.

## IV.   <u>FIRSTBANK AND THE LEHMAN BANKRUPTCY</u>

Lehman Holdings' bankruptcy petition constituted an "Event of Default" under FirstBank's Swap Agreement.  <u>See</u> Swap Agr. ¶ 5(a)(vii)(4).  Additionally, Lehman Swaps failed to make a required payment on Monday, September 15, constituting another Event of Default.  <u>See</u> Swap Agr. ¶ 5(a)(i); Stip. of Facts ¶ 32.

FirstBank was not served with notice of the bankruptcy sale and did not participate in the proceedings leading up to the sale. <u>See</u> Aff. of Service, Exs. A, B, <u>In re Lehman Bros. Holdings Inc.</u>, No. 08-13555 (Bankr. S.D.N.Y. Sept. 17, 2008), ECF No. 79 (service lists for Sale Motion); Notice of Hr'g, <u>In re Lehman Bros. Holdings</u>, No. 08-13555 (Bankr. S.D.N.Y. Sept. 18, 2008), ECF

No. 108 (announcing Sale Order Hearing to all appearing parties through ECF); Sale Order Hr'g Tr. 3-40 (list of appearances at Sale Order Hearing); cf. Limited Obj'n, Lehman Bros. Holdings (Nov. 28, 2008) (first appearance of FirstBank).

FirstBank did, of course, have notice that its own counterparty, Lehman Swaps, had failed to make a required payment on September 15, 2008.  Accordingly, FirstBank issued a valid Notice of Termination on or about September 24, 2008 (after Lehman Brokerage's bankruptcy sale, but before Lehman Swaps entered bankruptcy).  See Stip. of Facts ¶¶ 26, 32, 33.  Contrary to the requirements of the Credit Support Annex, Lehman Swaps did not return the Collateral to FirstBank after this termination.  This was an obvious breach of the Credit Support Annex.  See CSA ¶ 8(b)(3).

In response to Lehman Swaps' failure to return the Collateral, FirstBank offset a small portion of the unreturned Collateral by declining to pay approximately $2.6 million that FirstBank apparently owed Lehman Swaps as of the swaps' termination date.[8]

_____

[8]FirstBank could have also filed a proof of claim in the Bankruptcy Court against its own counterparty, Lehman Swaps, or against Lehman Swaps' guarantor, Lehman Holdings.  (At oral argument, Barclays's counsel represented that FirstBank would have received approximately 40% of the Collateral's value if FirstBank had done so.)  Instead, FirstBank filed a SIPA claim against Lehman Brokerage, on the theory that FirstBank was a "customer" of Lehman Brokerage because Lehman had held the Collateral in an account of Lehman Brokerage.  See Mot. of FirstBank for Reconsideration and Limited Intervention at 1, In re Lehman Bros. Inc., No. 08-1420 (Bankr. S.D.N.Y. Aug. 1, 2012), ECF No. 5197; J.A. 3447–3502 (FirstBank's customer claim).  The SIPA trustee for Lehman Brokerage denied FirstBank's claim, and the Bankruptcy Court has not

See Email of June 25, 2009, J.A. 2289.[9]  The remaining value of the unreturned Bonds was, as calculated by a Lehman employee using data from FirstBank, $61,271,854.39.[10]  See id.

In 2008 and 2009, representatives of FirstBank attempted unsuccessfully to learn what had happened to the Bonds.  See, e.g., Email from Lehman Counsel, Nov. 11, 2008, J.A. 3439 ("It is possible that the LBI [SIPA] trustee might be able to confirm for you whether it is holding the collateral."); Email from Counsel to LBI SIPA Trustee, Nov. 20, 2008, J.A. 3442 ("We are still working on it."); Email from Lehman Employee, July 1, 2009, J.A. 2297 ("[W]e do not have any authority to discuss/negotiate claims that involve FirstBank's desire to become senior to the other creditors with respect to your excess collateral."); Letter from Barclays Counsel, Sept. 25, 2009, J.A. 1363-64 ("[W]e . . . do not know which securities are at issue.").  Meanwhile, Lehman and Barclays

---

yet ruled on the merits.  See Stip. and Scheduling Order, In re Lehman Bros. Inc., No. 08-1420 (Bankr. S.D.N.Y. June 18, 2014), ECF No. 9179.

[9]We do not decide whether the calculations expressed in this email are accurate, or whether the email chain is correct in its apparent assumption that FirstBank owed Lehman Swaps for the windfall that FirstBank received when FirstBank replaced Lehman's swaps with cheaper swaps from other dealers.

[10]It is unclear from the record why FirstBank allowed Lehman to become so overcollateralized.  See Statement of Sept. 1, 2008 (showing over $63 million of collateral posted, against a requirement to post approximately $7 million); CSA ¶ 3(b) (allowing FirstBank to demand the return of significant excess collateral); see also Johnson, supra, at 996 ("To avoid becoming overcollateralized, a pledgor should carefully monitor both its exposure and the fair market value of its posted collateral on a regular basis.").

employees and counsel consistently referred to the Bonds as "collateral" in their internal discussions.  <u>See</u> Emails, J.A. 1366–72.

At some point in the summer of 2009, FirstBank learned from JPMorgan Chase (the custodian of the account in which Lehman Brokerage had held the Bonds on behalf of Lehman Swaps) that at least some of the Bonds had been transferred to Barclays.  <u>See</u> Rule 30(b)(6) Dep. of Victor Barreras for FirstBank at 40:23–42:8, Mar. 27, 2012, J.A. 3290–3365 ("Barreras Dep.").  Following that discovery, FirstBank demanded that Barclays reveal whether Barclays held the Bonds, and that Barclays return the Bonds.  <u>See</u> Letter, Sept. 17, 2009, J.A. 1359–61.

## V.   <u>THE PRESENT ACTION</u>

On December 21, 2009, FirstBank sued Barclays,[11] alleging several state law claims pursuant to this Court's diversity jurisdiction.[12]  Barclays moved to dismiss and requested that the District Court refer the case to the Bankruptcy Court as a case arising from the Bankruptcy Court's Sale Order.

---

[11]<u>FirstBank Puerto Rico v. Barclays Capital, Inc.</u> ("<u>FirstBank I</u>"), No. 09-cv-10317 (GBD) (S.D.N.Y.) (Daniels, J.).

[12]It is well-established that a federal court may exercise diversity jurisdiction over a dispute between a citizen of Puerto Rico (such as FirstBank) and a citizen of a State (such as Barclays).  <u>See</u> 28 U.S.C. § 1332(e); <u>Lummus v. C'wealth Oil Refining Co.</u>, 195 F. Supp. 47, 49–51 (S.D.N.Y.) (relying on <u>Nat'l Mut. Ins. Co. of D.C. v. Tidewater Transfer Co.</u>, 337 U.S. 582 (1949)), <u>aff'd</u>, 297 F.2d 80, 87 (2d Cir. 1961).

The District Court granted in part and denied in part Barclays's motion to dismiss. Order, <u>FirstBank I</u>, May 3, 2010, ECF No. 22. The surviving claims were a claim for conversion, a claim for unjust enrichment, and a claim to impose a constructive trust and compel an accounting. <u>See</u> <u>id.</u> The District Court then referred the case to the Bankruptcy Court for further proceedings. <u>See</u> Order, <u>FirstBank I</u>, Sept. 7, 2010, ECF No. 44. In so doing, Judge Daniels noted that the Clarification Letter at least purported to transfer the Bonds to Barclays, contrary to FirstBank's allegation that the Bonds had never passed to Barclays. <u>See</u> <u>id.</u> at 2.

After substantial discovery, the Bankruptcy Court[13] granted summary judgment to Barclays, holding that the Bonds were "Purchased Assets" under the Clarification Letter's expanded definition, and that the Sale Order therefore prohibited FirstBank's claims against Barclays. <u>See</u> <u>FirstBank II</u>, 492 B.R. 191 (Bankr. S.D.N.Y. 2013) (the "Summary Judgment Order"). The Bankruptcy Court later imposed sanctions against FirstBank for failing to comply with the Sale Order's anti-suit injunction. <u>See</u> <u>FirstBank II</u>, 2013 WL 6283572 (Bankr. S.D.N.Y. Dec. 3, 2013) (the "Contempt Order").

---

[13] <u>FirstBank Puerto Rico v. Barclays Capital, Inc.</u> ("<u>FirstBank II</u>"), Ch. 11 Case No. 08-bk-13555, Adv. Proc. No. 10-ap-4103 (Bankr. S.D.N.Y.) (Peck, J.).

FirstBank timely appealed both the Summary Judgment Order and the Contempt Order, and we consolidated the appeals.  See Order, <u>FirstBank Puerto Rico</u> v. Barclays Capital, Inc., No. 13-cv-4732 (NRB) (S.D.N.Y. Mar. 27, 2014), ECF No. 9.

## DISCUSSION

**I.   THE SUMMARY JUDGMENT ORDER**

### A.   Standard of Review

We review the Summary Judgment Order de novo, drawing all factual inferences in favor of the non-moving party, FirstBank. <u>See Hanover Direct, Inc. v. T.R. Acquisition Corp.</u> (<u>In re T.R. Acquisition Corp.</u>), 309 B.R. 830, 835 (S.D.N.Y. 2003).

### B.   The Intra-Lehman Repos Cut Off FirstBank's Interest in the Collateral.

A rehypothecation clause, by its own terms, allows a secured party in possession of collateral to dispose of the collateral "free" of the pledgor's interest.  <u>See</u> CSA ¶ 6(c).  This means that, once the secured party transfers title over collateral to some other person, the pledgor has no rights to the collateral as against the transferee.  Instead, the pledgor has a right in contract to demand that the secured party return the collateral under the terms of the parties' Credit Support Annex.  <u>See</u> CSA ¶ 6(c) (reserving pledgor's rights under CSA ¶¶ 3(b) and 8(b)); Johnson, <u>supra</u>, at 981; <u>cf.</u> ISDA, <u>User's Guide to the 1994 ISDA</u>

Credit Support Annex at 13 (1994) ("Parties should carefully consider the risks attendant to the rehypothecation or other disposition of Posted Collateral both to the Secured Party and to the Pledgor and consult with their legal advisors before documenting a Transaction . . . under the Annex that permits . . . rehypothecation . . . .") (full sentence bolded in original).

It follows that, once Lehman Swaps sold the Collateral to Lehman Brokerage pursuant to FirstBank's Credit Support Annex, FirstBank lost all rights to the Collateral as against Lehman Brokerage (or any subsequent transferee). Instead, the Collateral became outright property of Lehman Brokerage and FirstBank retained only contractual rights against its own counterparties, including (1) the right to demand that Lehman Swaps return excess Collateral (CSA ¶ 3(b)); (2) the right to demand the return of all collateral upon an event of default (CSA ¶ 8(b)); (3) the right to withhold any swap payments to compensate for Lehman Swaps' failure to return collateral (CSA ¶ 8(c)); and (4) the right to sue Lehman Swaps or Lehman Holdings for breach of contract.[14]

---

[14]We acknowledge that Barclays Lehman continued to refer to the Bonds informally as "collateral." These emails have no legal consequence. Most likely, those Barclays and Lehman personnel referred to the Collateral as "collateral" for the same reason that we do: it is simpler to say "FirstBank's collateral" than to say "bonds formerly belonging to FirstBank whose title has since passed to Barclays through collateralization, rehypothecation, and a bankruptcy sale."

FirstBank also points out that, according to Barclays's expert, FirstBank was entitled to treat the Collateral as FirstBank's own asset in FirstBank's books and records. See Dep. of David Maloy, J.A. 2926-3021 ("Maloy Dep.") at 97:10-20 ("they pledged their asset and the asset is still theirs."). The asset is "theirs" only in the sense that FirstBank retained

To avoid this straightforward conclusion, FirstBank argues that legal title to bonds does not pass from borrower to lender in a repo and that we should assess FirstBank's rights without reference to the Intra-Lehman Repos.

FirstBank is simply wrong to say that a repo does not transfer legal title to a bond. See In re Lehman Bros. Inc., 506 B.R. at 349 (S.D.N.Y. 2014); Lehman MRA at ¶ 8 ("Title to all Purchased Securities shall pass to Buyer and, unless otherwise agreed by Buyer and Seller, nothing in this Agreement shall preclude Buyer from engaging in repurchase transactions with the Purchased Securities or otherwise pledging or hypothecating the Purchased Securities. . . .").

FirstBank's more interesting argument is that FirstBank's interest in the Bonds survived the Intra-Lehman Repos.   As FirstBank accurately describes, Lehman Brokerage employees acted on both sides of the Intra-Lehman Repos, Lehman Swaps was a wholly owned subsidiary of Lehman Brokerage, and Lehman Brokerage already managed the Bonds in its capacity as Lehman Swaps' agent.

However, none of this matters.  FirstBank's Credit Support Annex is clear that <u>any</u> permitted sale of the Collateral is "free"

---

its exposure to the Bonds after the Collateral was sold to Lehman Brokerage (<u>see</u> <u>supra</u> at 7), not in the sense that FirstBank retained legal title.  It may well be the case that, for at least some accounting purposes, both FirstBank and Lehman treated the Collateral as belonging to FirstBank, but this accounting treatment simply reflected the economic reality that FirstBank had "reason to expect that [Lehman Swaps] w[ould] return [the] collateral." Maloy Dep. at 97:21-7.

of FirstBank's interest.  This includes a sale between two Lehman entities, and a sale in which a different Lehman entity acts as Lehman Swaps' agent.  Indeed, the Credit Support Annex contemplated that Lehman could unilaterally destroy FirstBank's interest in the Collateral without selling the Collateral in an arm's-length transaction.  <u>See</u> CSA ¶ 6(c) (providing that "commingl[ing]" collateral would free the collateral from the pledgor's claims).

Nor did Lehman Swaps' default on September 15, 2008, restore FirstBank's property interest in the Bonds.  <u>Cf.</u> Dep. of Christian Johnson, J.A. 2785–2857 ("Johnson Dep.") at 78:18–79:21 (conceding that the Intra-Lehman Repos were permitted uses of the Collateral, but with the caveat that Lehman Swaps' permission to use the Collateral terminated on September 15).  The significance of Lehman Swaps' September 15 default was that (1) Lehman Swaps was no longer permitted to rehypothecate collateral that had not yet been rehypothecated, and (2) Lehman Swaps was obligated, as a matter of contract, to retrieve any rehypothecated collateral and to restore it to FirstBank.  Nothing in the Credit Support Annex, however, supports the idea that the default somehow restored FirstBank to property rights against transferees of the Collateral (such as Lehman Brokerage).

Because the Intra-Lehman Repos cut off FirstBank's interest in the Bonds, the Bonds' later history is academic.  Barclays owns the

Bonds so long as (1) Lehman Brokerage transferred the Bonds to Barclays and (2) that transfer was enforceable as between Lehman Brokerage and Barclays.  There is no question that Lehman Brokerage transferred the Bonds to Barclays through the Clarification Letter, or that the Clarification Letter is enforceable between Lehman Brokerage and Barclays.  See In re Lehman Bros. Holding Inc., 761 F.3d 303, 312–13 (2d Cir. 2014) (enforcing Clarification Letter to allocate $1.9 billion in "clearance box assets" to Barclays), petition for cert. filed sub nom. Giddens v. Barclays Capital Inc., No. 14-____ (Dec. 15, 2014).  Therefore, we can conclude without further analysis of the bankruptcy sale that FirstBank, as a previous holder of assets subject to the bankruptcy sale, has no basis to sue Barclays.

Nevertheless, we will examine the Sale Order and the Clarification Letter because the meaning of the Sale Order is relevant to our affirmance of the Contempt Order.

3. **The Sale Order and Clarification Letter Transferred the Collateral to Barclays.**

The text of the Sale Order is undisputed.  The Sale Order allowed Barclays to buy "Purchased Assets" of Lehman Brokerage, free and clear of third parties' interests.  See Sale Order § 3. The Sale Order even allowed Barclays to buy "Purchased Assets" that were subject to bona fide disputes between Lehman and third

parties.   <u>See</u> Sale Order § 4 (authorizing sale pursuant to 11 U.S.C. § 363(f)); 11 U.S.C. § 363(f)(4) (authorizing sale "free and clear" of any interest in "bona fide dispute").   In such a case, the third party's claim was converted into a claim against the money that the Lehman trustee received from Barclays.   <u>See</u> Sale Order § 4.

It is also undisputed that the Clarification Letter purported to transfer the Collateral.   <u>See</u> Clar. Letter ¶¶ 1(a)(ii), 13.

Furthermore, the Sale Order incorporated the Clarification Letter.  The Sale Order did so by defining the "Purchase Agreement" to include (1) the original Asset Purchase Agreement (with one amendment) that was presented to the Bankruptcy Court at the Sale Order Hearing; and (2) "that letter agreement clarifying and supplementing the Asset Purchase Agreement dated September 20, 2008".  <u>See</u> Sale Order at 1; <u>In re Lehman Bros. Inc.</u>, 478 B.R. 570, 577 (S.D.N.Y. 2012), <u>aff'd sub nom.</u> <u>In re Lehman Bros. Holding Inc.</u>, 761 F.3d at 303, <u>supra</u>.  The Sale Order permitted Lehman and Barclays to make only "non-material modifications" to the "Purchase Agreement," § 25, but placed no "materiality" restriction on the Clarification Letter, which was itself defined to be part of the "Purchase Agreement."   <u>See</u> <u>In re Lehman Bros. Inc.</u>, 478 B.R. at 584.

We recognize that the Bankruptcy Court was disturbed that the Clarification Letter went beyond what the parties had presented to the Bankruptcy Court at the Sale Order Hearing. See In re Lehman Bros. Inc., 445 B.R. 143, 151 (Bankr. S.D.N.Y. 2011) ("The Clarification Letter includes any number of clarifications that are really more than that . . . . This is a document that should have been subjected to further judicial oversight . . . ."), aff'd in part and rev'd in part, 478 B.R. at 570, supra. Nevertheless, the Bankruptcy Court was clearly not disturbed enough to modify the Sale Order at any time, or to deny Barclays's motions in this case. Indeed, if the Sale Order approved the entire Clarification Letter on the basis of mistake, inadvertence, or misrepresentation, then the proper remedy was for the Bankruptcy Court to amend the Sale Order to narrow the definition of "Purchase Agreement" or to reduce the scope of the anti-suit injunction. See Fed. R. Bankr. P. 9024 (incorporating most of Fed. R. Civ. P. 60); Fed. R. Civ. P. 60(b)(1),(3).

Because no party successfully moved for relief under Rule 60, we are bound to apply the Sale Order as written—even if the Bankruptcy Court has reason to regret its pre-approval of the Clarification Letter, and even if it was improper under section 363 of the Bankruptcy Code for the Sale Order to pre-approve the Clarification Letter sight unseen. See Celotex Corp. v. Edwards,

514 U.S. 300 (1995) (holding that a bankruptcy court's order may not be collaterally attacked, when the target of the order had failed to seek relief or file a direct appeal).

Turning to the Clarification Letter,[15] we conclude that the Bonds constituted "Purchased Assets" transferred to Barclays under the authorization of the Sale Order.   First, the Clarification Letter provided that securities subject to the Barclays Repo were "deemed to constitute part of the Purchased Assets."   Clar. Letter ¶ 13.   Second, the Clarification Letter listed the Bonds in its Appendix A as "Purchased Assets."   ¶ 1(a)(ii).

Finally, we consider FirstBank's argument that due process does not permit the Sale Order to be enforced against FirstBank because FirstBank lacked notice of the Sale Order.   The fundamental problem with this argument is that FirstBank did not have a property interest in the Bonds before the bankruptcy sale. FirstBank had lost its property interest when Lehman Swaps sold the Collateral to Lehman Brokerage under the authority of the Credit Support Annex's Rehypothecation Clause, and so due process did not require FirstBank to receive _any_ notice of the sale.

This is a narrow holding.   We do not decide the question whether a person _with_ a cognizable property interest may attack a

---

[15]We pass over Barclays's alternative argument that the original Asset Purchase Agreement transferred the Bonds from Lehman Brokerage to Barclays, because Barclays did not present this argument below.

final "free and clear" sale order in the absence of notice.[16]  Nor

do we decide whether lack of notice could be grounds to file a late

claim against the proceeds of the bankruptcy sale, or grounds for

relief from a sale order under Rule 60(b)(6).  Nor, moreover, do we

decide whether a sale order's finding of adequate notice is <u>res</u>

<u>judicata</u> against parties who actually lacked notice, or whether the

Bankruptcy Court's finding of adequate notice in this particular

case's Sale Order was correct.  We simply hold that FirstBank, a

person no interest whatsoever in the property at stake, had no

right to be notified.

## II.   <u>**THE CONTEMPT ORDER**</u>

### A.   <u>**Standard of Review**</u>

Although we may set aside the Contempt Order only for abuse of

discretion, our review is "'more exacting than under the ordinary

abuse-of-discretion standard because a [bankruptcy] court's

contempt power is narrowly circumscribed.'"  <u>In re A.T. Reynolds &</u>

<u>Sons, Inc.</u>, 452 B.R. 374, 380 (S.D.N.Y. 2011) (alteration in

original) (quoting <u>Perez v. Danbury Hosp.</u>, 347 F.3d 419, 423

(2d Cir. 2003)).  An abuse of discretion occurs when a decision

relies on an erroneous view of the law, when a decision relies on

_____

[16]This question is open in our circuit.  <u>Compare</u> <u>In re Edwards</u>, 962 F.2d
641, 642, 645 (7th Cir. 1992) ("The bona fide purchaser at a bankruptcy sale
gets good title" even though "[t]o take away a person's property . . . without
compensation or even notice is pretty shocking . . . ."), <u>with</u> <u>In re Ex-Cel</u>
<u>Concrete Co.</u>, 178 B.R. 198, 205 (B.A.P. 9th Cir. 1995) ("lack of any notice
. . . was a jurisdictional defect sufficient to result in a void order").

a clearly erroneous assessment of evidence,[17] or when a decision otherwise "cannot be located within the range of permissible decisions." Id.

    **B.**   **The Bankruptcy Court Relied on a Correct View of the Law.**

        **1.**   *FirstBank's Actions Meet the Standard for Contempt.*

Contempt is appropriate when "(1) the order the contemnor failed to comply with is clear and unambiguous, (2) the proof of noncompliance is clear and convincing, and (3) the contemnor has not diligently attempted to comply in a reasonable manner." Paramedics Electromedicina Comercial, Ltda. v. GE Med. Sys. Info. Techs., Inc., 369 F.3d 645, 655 (2d Cir. 2004). This is precisely the test that the Bankruptcy Court applied. See Contempt Order, 2013 WL 6283572 at *1.

The Sale Order is clear and unambiguous. The Sale Order clearly prohibits suits with respect to "Purchased Assets" as defined in the "Purchase Agreement," the Sale Order clearly incorporates the Clarification Letter into its definition of the

---

[17]Here, there has been no suggestion that the Contempt Order relied on incorrect facts, as the relevant facts surrounding FirstBank's dealing with Lehman, Lehman's bankruptcy sale, and this litigation are largely undisputed. Therefore, we need only review the other prongs of this test.

"Purchase Agreement,"[18] and the Clarification Letter clearly defines "Purchased Assets" to include the Collateral.[19]

Proof of non-compliance is clear and convincing.  There is no question that FirstBank filed a suit against Barclays relating to securities that we have held to constitute "Purchased Assets."  The "diligent attempt to comply" prong is not relevant to this case, as it was FirstBank's <u>affirmative</u> act that violated the Sale Order's anti-suit injunction.

## 2. *Subjective Good Faith Did Not Bar the Contempt Order.*

The Bankruptcy Court also correctly held that subjective good faith is not a bar to contempt.  "The violation need not be willful, but it must be demonstrated that the contemnor was not reasonably diligent in attempting to comply." <u>City of New York v. Local 28, Sheet Metal Workers' Int'l Ass'n</u>, 170 F.3d 279, 283 (2d Cir. 1999) (internal quotation omitted); <u>but cf.</u> <u>Vuitton et Fils S.A. v. Carousel Handbags</u>, 592 F.2d 126, 130-31 (2d Cir. 1979)

---

[18]Again, we express no view whether it was either permissible or well-advised under the exigent circumstances for the Bankruptcy Court to pre-approve a document that was not available to the court.  Whether proper or not, it is clear that that is what the Sale Order in fact did.

[19]FirstBank argues that Rule 65 of the Federal Rules of Civil Procedure requires an injunction to be clear and unambiguous on the face of the order, without reference to external documents such as the Clarification Letter and the Clarification Letter's Appendix A.  Rule 65 does not apply to bankruptcy cases (except for adversary proceedings, <u>see</u> Fed. R. Bankr. P. 7065), and for good reason.  It would be impractical for a typical sale order to include as much detail about the assets of a bankrupt business as FirstBank suggests Rule 65 would require.

(requiring a finding of willfulness before awarding costs of prosecuting contempt motion); <u>N.Y. State Nat'l Org. for Women v. Terry</u>, 952 F. Supp. 1033, 1044 (S.D.N.Y. 1997) (same).

Even so, FirstBank's contempt <u>was</u> willful, and, "while willfulness may not necessarily be a prerequisite to an award of fees and costs, a finding of willfulness strongly supports granting them." <u>Weitzman v. Stein</u>, 98 F.3d 717, 719 (2d Cir. 1996). Contempt is willful when the contemnor had actual notice of the order, could have complied, did not seek modification, and did not make a good-faith effort to comply. <u>See, e.g.</u>, <u>Bear U.S.A., Inc. v. Kim</u>, 71 F. Supp. 2d 237, 249 (S.D.N.Y. 1999).

According to this test, FirstBank's contempt was plainly willful. By the time that FirstBank brought its summary judgment motion, FirstBank had actual notice of the entire Sale Order, including the Clarification Letter and the Clarification Letter's Appendix A; FirstBank could have complied with the Sale Order at that point by dismissing this action with prejudice, but did not; and FirstBank did not seek modification.[20]

In the context of the automatic stay, the Second Circuit has held that a good-faith mistake does not preclude a finding of

---

[20]The Rule 60(c)(1) time bar does not bar a motion for modification of on order on grounds of lack of notice, so long as the motion is made within a reasonable time under the circumstances. Without deciding whether a Rule 60 motion should have succeeded, we can at least say that a Rule 60 motion would not have been so certainly futile as to excuse FirstBank from seeking modification.

contempt.  See Weber v. SEFCU (In re Weber), 719 F.3d 72, 82–83
(2d Cir. 2013).  Relying on Maritime Asbestosis Legal Clinic v. LTV
Steel Co. (In re Chateaugay Corp.), 920 F.2d 183, 186–87 (2d Cir.
1990), in which the court declined to enter a contempt order
against a legal clinic that had violated the automatic stay with
respect to a bankruptcy corporation, FirstBank argues that
subjective good faith is a bar to contempt in a case involving non-
natural entities.

    FirstBank misapprehends the distinction between individuals
and entities in the context of an automatic stay violation.  The
distinction is that an individual who suffers a willful stay
violation must be awarded at least actual damages, while an entity
that suffers a willful stay violation will be awarded damages in
the discretion of the bankruptcy court.  See 11 U.S.C. § 362(k)
(mandatory damages for individuals); In re Spookyworld, Inc.,
346 F.3d 1, 8 (1st Cir. 2003) (noting that debtor-corporations may
move for contempt under section 105(a)).  However, section 362(k)
itself demonstrates that "good faith" and "willful" violations are
not mutually exclusive concepts.  Subsection 362(k)(1) allows a
court to impose punitive damages for willful violations of the
automatic stay, while subsection 362(k)(2) forbids punitive damages
when the violation of section 362(k)(1) (i.e., a willful violation)

was made in a good-faith belief that section 362(h) permitted the contemptuous act.

In short, we believe the better view is that subjective good faith is merely a factor that a bankruptcy court may consider in deciding whether to impose sanctions for the willful violation of an order.

### 3. *The District Court's Denial of Barclays's Motion to Dismiss Did Not Bar the Contempt Order.*

We mention in passing FirstBank's argument that this Court's (per Judge Daniels) partial denial of Barclays's motion to dismiss was "law of the case" that barred the Bankruptcy Court from holding FirstBank in contempt.  The Contempt Order and the motion to dismiss turned on different issues.  The Contempt Order largely turned on whether the Bonds were "Purchased Assets."  If so, then the Sale Order's anti-suit injunction applied and contempt was permissible; if not, then not.  By contrast, the District Court's denial of the motion to dismiss assumed as true the assertion that the Bonds were not "Purchased Assets."  With a post-discovery record available, there was no need for the Bankruptcy Court to make the same artificial assumption.

### C. <u>The Contempt Order Was Within the Range of Permissible Decisions.</u>

Under the circumstances of this case, it was not an abuse of discretion for the Bankruptcy Court to order FirstBank to pay

Barclays's "reasonable counsel fees and costs incurred in defending against this litigation that has been pursued knowingly by FirstBank in violation of the Sale Order."   Contempt Order at *5.

Strong policy reasons exist to protect a purchase of estate assets from future litigation costs.   An injunction with teeth encourages more prospective buyers to participate in sales and auctions under section 363, and to offer higher prices for a debtor's assets, ultimately to the benefit of creditors.   This is particularly important in the present case, in which the global financial system desperately needed a buyer such as Barclays to step forward to purchase Lehman's assets quickly, and in which, without a robust injunction, Barclays would otherwise have risked law suits from hundreds of thousands of Lehman creditors whose complex financial transactions were disrupted by the Lehman bankruptcy.

We note that the Bankruptcy Court did not impose sanctions for FirstBank's first contemptuous act.[21]   Instead, the Bankruptcy Court gave FirstBank an opportunity, after extensive discovery, to withdraw its suit after discovery without facing sanctions.

We recognize, along with the Bankruptcy Court, that FirstBank acted in good faith.   Nevertheless, FirstBank's good faith does not

---

[21]Unlike the Contempt Order before us, an immediate contempt order for filing suit might have been reversible——not as a matter of law, but simply as an improvident exercise of discretion.

-36-

prevent sanctions as a matter of law, and we believe that sanctions were permissible in light of the need for protecting section 363 purchasers and the Bankruptcy Court's prudent handling of this case.

## CONCLUSION

The judgments of the Bankruptcy Court are affirmed.  The clerk is directed to enter judgment for appellee and to close the case.

Dated:      New York, New York
            December _18_, 2014

NAOMI REICE BUCHWALD
UNITED STATES DISTRICT JUDGE

| TABLE 1<br>FirstBank Collateral<br>(see text at note 7) | | | | |
|---|---|---|---|---|
| | All Collateral | | Repoed Collateral | |
| CUSIP | Quantity | Approx. Market<br>Value (8/29/08) | Quantity | Approx. Market<br>Value (8/29/08) |
| 31391JPY0 | 30,950,709 | $5,509,517 | 30,950,709 | $5,509,517 |
| 31391KYD3 | 2,000,000 | $403,158 | 2,000,000 | $403,158 |
| 31390MKJ2 | 7,000,000 | $1,551,579 | 7,000,000 | $1,551,579 |
| 31371KWF4 | 2,073,064 | $388,146 | 2,073,064 | $388,146 |
| 31401JVN5 | 24,000,915 | $7,635,026 | 24,000,915 | $7,635,026 |
| 31400CDE1 | 8,000,000 | $2,227,662 | 8,000,000 | $2,227,662 |
| 31401NW39 | 7,800,000 | $1,646,913 | 7,800,000 | $1,646,913 |
| 31402A4J2 | 6,193,841 | $2,244,334 | 6,193,841 | $2,244,334 |
| 31401AG84 | 15,181,749 | $4,861,287 | 15,181,749 | $4,861,287 |
| 31376J7J2 | 15,000,000 | $5,775,107 | 12,100,000 | $4,658,586 |
| 31400CAT1 | 15,000,000 | $3,934,573 | 4,630,000 | $1,214,472 |
| 31402D5A4 | 18,190,000 | $6,732,383 | 18,090,000 | $6,695,372 |
| 31391Y6N2 | 9,591,196 | $2,827,724 | 6,543,000 | $1,929,040 |
| 31402FBD6 | 6,711,261 | $2,969,658 | 4,500,000 | $1,991,200 |
| 31402BDE1 | 2,000,000 | $757,947 | 2,000,000 | $757,947 |
| 31401HJ45 | 8,302,184 | $2,049,626 | 8,302,184 | $2,049,626 |
| 31401NP29 | 10,838,817 | $3,726,333 | 10,838,817 | $3,726,333 |
| 31402HH61 | 10,201,592 | $3,784,894 | 10,201,592 | $3,784,894 |
| 31366LFL5 | 3,868,461 | $20,132 | 3,868,461 | $20,132 |
| 36202KAL9 | 4,500,000 | $4,500,000 | 4,500,000 | $4,500,000 |
| 31391Y3S4 | 1,000,000 | $323,673 | 0 | $0 |
| 31401C3G6 | 1,000,000 | $314,507 | 0 | $0 |
| 31401H7M8 | 10,205,000 | $3,382,418 | 0 | $0 |
| Total | | $67,566,597 | | $57,795,223 |
| Source | Stip. ¶ 12 | Sept. 1 Stmt. | Stip. ¶ 12 | Calculated |